UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEVIN HILL

               Petitioner,              Case No. 1:13-cv-541

v.                                      Honorable Paul L. Maloney

SHERRY BURT

               Respondent.
_____/


## OPINION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.

Following a jury trial in the Macomb County Circuit Court, Petitioner Kevin Hill was convicted of assault

with intent to murder, MICH. COMP. LAWS § 750.83, and acquitted of three other counts. On July 17,

2008, the court sentenced Petitioner to a prison term of 12 to 20 years. In his *pro se* petition, Petitioner

raises eight grounds for relief, as follows:

    I.     WAS THERE A DENIAL OF DUE PROCESS THAT REQUIRED A NEW
           TRIAL OR AT LEAST AN EVIDENTIARY HEARING WHEN ONE OF
           THE JURORS EXPRESSED BEING PRIVY TO NEGATIVE
           INFORMATION THAT DID PREJUDICE THE DEFENDANT?

    II.    DID THE TRIAL JUDGE VIOLATE PETITIONER'S DUE PROCESS RIGHT
           TO A FAIR TRIAL BY AN IMPARTIAL DECISION MAKER WHEN SHE
           ADMITTED TO DISCUSSING THE CASE WITH OUTSIDE SOURCES
           BEFORE THE TRIAL ITSELF ENSU[]ED, AND WAS TRIAL COUNSEL
           INEFFECTIVE FOR NOT REQUESTING A HEARING TO DETERMINE
           WHTHER THE TRIAL JUDGE WAS ABLE TO ENSURE AN UN-BIAS[ED]
           NATURE DURING TRIAL?

III.   DID PROSECUTORIAL MISCONDUCT DEPRIVE PETITIONER OF HIS
UNITED STATES CONSTITUTION V AND XIV AMENDMENTS TO A
FAIR TRIAL, AND WAS TRIAL COUNSEL INEFFECTIVE FOR NOT
OBJECTING, WHERE THE PROSECUTOR MISREPRESENTED THE
EVIDENCE TO SUPPORT THIS ARGUMENTS [SIC] AND VOUCHED
FOR WITNESSES' CREDIBILITY?

IV.   DID TRIAL COURT'S FAILURE TO ASCERTAIN ON RECORD
WHETHER PETITIONER INTELLIGENTLY AND KNOWINGLY
WAIVE[D] HIS RIGHT TO TESTIFY REQUIRE A NEW TRIAL?

V.   WAS PETITIONER DENIED HIS SIXTH AMENDMENT RIGHT TO
EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S EGREGIOUS
AND PREJUDICIAL ERRORS?

VI.   WAS PETITIONER DENIED EFFECTIVE ASSISTANCE OF COUNSEL
GUARANTEED BY THE FEDERAL CONSTITUTION WHERE HIS
APPEL[L]ATE COUNSEL NEGLECTED STRONG AND CRITICAL
ISSUES WHICH MUST BE SEEN AS SIGNIFICANT AND OBVIOUS?

VII.   SHOULD RELIEF FROM JUDGMENT BE GRANTED WHERE
PETITIONER CAN ESTABLISH GOOD CAUSE FOR NOT BRINGING
HIS APPELLATE ISSUE BEFORE THE COURT PREVIOUSLY AND
ACTUAL PREJUDICE DUE TO THE INVALID SENTENCE?

VIII.   DID MICHIGAN COURT OF APPEALS USE OF THE PHRASE "DENIED
BECAUSE PETITIONER FAILED TO MEET THE BURDEN OF
ESTABLISHING ENTITLEMENT TO RELIEF UNDER MCF 6.500(D) IN
ONE SENTENCE ORDER INDICATE THAT ITS DECISION W[A]S
BASED ON THE MERITS?

(Am. Pet., ECF No. 11, PageID.93-94.)  On February 19, 2014, Respondent filed an answer to the

petition (ECF No. 17), stating that the grounds should be denied because they are noncognizable,

procedurally defaulted, and/or without merit.  On March 4, 2014, Respondent filed the state-court record,

pursuant to Rule 5, RULES GOVERNING § 2254 CASES (ECF Nos. 19-40).  Upon review and applying the

AEDPA standards, the Court finds that all habeas grounds are either noncognizable or meritless. Accordingly, the Court will deny the petition for failure to raise a meritorious federal claim.

### Procedural and Factual Background

Petitioner's conviction arose out of his participation in an attempt to murder Asim Balcinovic and injure Ruka Anadoli. He was charged with one count each of first-degree home invasion, assault with intent to murder, conspiracy to assault with intent to murder, and assault with a dangerous weapon. Following a preliminary examination held on October 3, 2007, Petitioner was bound over on all four charges. (Prelim. Exam. Tr., 223, ECF No. 20.)

Petitioner was tried by a jury beginning on May 15, 2008 and ending on May 28, 2008,[1] alongside his co-defendant Zoran Vezirovic,[2] Before beginning jury selection, the court considered the report of a forensic psychologist, who examined Petitioner for competency to stand trial. (Tr. I, 5.) Defense counsel stipulated to Petitioner's competency based on the report, and the court found Petitioner competent to stand trial. (*Id.*) The prosecutor stipulated that the forensic report would not be used against

---

[1] Trial transcripts are referenced as follows:
Volume I, May 15, 2008 (ECF No. 27): "Tr. I, __."
Volume II, May 16, 2008 (ECF No. 28): "Tr. II __."
Volume III, May 20, 2008 (ECF No. 29): "Tr. III, __."
Volume IV, May 22, 2008 (ECF No. 30): "Tr. IV, __."
Volume V, May 23, 2008 (ECF No. 31): "Tr. V, __."
Volume VI, May 27, 2008 (ECF No. 32): "Tr. VI, __."
Volume VII, May 28, 2008 (ECF No. 33): "Tr. VII, __."

[2] A third co-defendant, Mario Reed, pleaded guilty on January 23, 2008, to lesser charges of assault with intent to commit great bodily harm and third-degree home invasion. The plea agreement included a requirement for Reed to testify truthfully at Petitioner's trial, and it included a sentence agreement of 30 months, potentially in a boot camp. (Tr. I, 119-120.) The parties and the court agreed to instruct the jury about the minimum guidelines sentence Reed likely faced on the first-degree home invasion, assault with intent to commit murder, and conspiracy to commit first-degree murder before taking the plea: 10 years 6 months to 17 years and 6 months. (*Id.*, 133-34.)

Petitioner at trial during the prosecutor's case in chief.  The prosecutor noted, however, that if Petitioner testified, any statements against interest given to the investigator at the Forensic Center could potentially be used in cross-examination. (*Id.*, 6-7.)

Sterling Heights Patrol Officer Gregory Muir testified that, on August 17, 2007, he was working the night shift.  Sometime between midnight and 5:30 a.m., he responded to a call from 35822 Monaco about a possible breaking and entering.  (Tr. II, 164, 174.)  Another police officer, Officer Conover, arrived just behind him.  When Muir arrived, a person was in the front yard, pointing at the house and telling him that everyone was inside.  He ran up to the house and saw a struggle between individuals on the floor near the door, in which a larger white male was on top of a smaller black male.  (*Id.* at 164-65.)  Muir noticed a small knife on the floor, which he kicked away.  The white man rolled off the black man, and, after some words were exchanged, the officers placed the black man, whom he identified as Petitioner, in handcuffs.  (*Id.*, 165-66.)  In addition to the knife, Muir noticed some blood splatter on the floor.  (*Id.*, 166.)  Muir asked Petitioner if he was with anyone else, and Petitioner said that there was a man outside, who was sitting in a silver Impala.  (*Id.*, 167.)  When he went outside, Muir saw a silver Impala driving very slowly, just south of the address.  He ran out to the street to stop the vehicle, and, with his weapon drawn, he ordered the driver, a black male, out of the vehicle.  (*Id.*, 168.)  The vehicle continued to move for a short time, but the driver eventually put the car in park.  Muir then patted the driver down, placed him in handcuffs, and put him in the back of the patrol car.  (*Id.*, 169.)

Sterling Heights Patrol Officer Jason Hakim testified that, sometime near 5:30 a.m. on August 17, 2007, he went to the address in question in response to a 911 call.  (*Id.*, 181-82.)  He saw Officer Muir outside next to a silver Impala, and Muir told him that another officer was in the house with

a suspect.  At the house, Hakim saw Officer Conover with a handcuffed black male in the foyer. (*Id.*, 183.)

The man, whom Hakim identified as Petitioner, was bleeding from his head area.  (*Id.*, 191.)  Hakim was

approached by a man who identified himself as the home owner.  (*Id.*, 183.)  The homeowner was carrying

a kitchen knife, which he stated he had taken from the man who was in custody.  (*Id.*, 184.)  Using gloved

hands, Hakim took the knife from the homeowner and put it on a table for a moment.  (*Id.*, 185, 190.)

Hakim also saw a baseball bat, which he identified as the one depicted in People's Exhibit 66.  (*Id.*, 185.)

Hakim talked to a number of people at the house, including the male victim, who spoke somewhat broken

English, the victim's stepdaughter and stepson, and the woman who appeared to be the victim's wife, Ruka

Anadoli.  (*Id.*, 187-88.)  Hakim understood from the male victim that, while Petitioner was attempting to

run out the door, the victim had taken Petitioner down to the floor and held him.  (*Id.*, 194.)

   Sterling Heights Patrol Officer Chad Conover stated that an unknown female had pointed

him to the house when he arrived at 35822 Monaco at about 5:30 a.m. on August 17, 2007.  (*Id.*, 196,

201.)  He followed Officer Muir into the house.  (*Id.*, 196.)  When he entered, he saw the homeowner,

Asim Balcinovic, lying on top of Petitioner, who was bleeding from the back of the head.  (*Id.*, 197-98,

206.)  Conover placed Petitioner in handcuffs.  (*Id.*, 198.)  Conover noticed a knife on the floor.  (*Id.*,

199.)  Conover identified pictures of the knife, baseball bat, mask and gloves that he remembered seeing

in the house.  (*Id.*, 200-01.)

   Patrol Officer David Cook testified that he responded to the 911 call as backup.  Together

with Officer Susanna, he transferred Petitioner to the Henry Ford Macomb Hospital for treatment.  (*Id.*,

210-11.)  They were subsequently relieved by another officer.  (*Id.*, 211.)

Sterling Heights Officer Phillip Giuliani arrived at the home in the early morning of August 17, 2007. He arrived minutes after the other officers and served as an evidence officer that day. (*Id.*, 216-17.) He took the photographs used by the prosecution. (*Id.*, 218.) On a later date, he took into evidence two pieces of paper that were in the cup holders of the Impala, one of which was yellow. The yellow piece of paper contained the address of 35822 Monaco. (*Id.*, 220-21.) The evidence bag also included a white Kroger receipt. (*Id.*, 235.) Giuliani testified that, using rubber gloves, he placed the knife into an evidence bag and placed a biohazard label on it because it appeared to contain dried blood on the tip. (*Id.*, 226.) Giuliani noted that the handle of the knife had been wrapped with duct tape, which he opined was used to aid in concealing fingerprints. (*Id.*, 228.) In addition, Giuliani took the baseball bat into evidence from its place on the loveseat in the living room. (*Id.*, 229.) He also took into evidence the ski mask and a pair of black mittens, which were found in the front living room foyer area. (*Id.*, 230-31.) Giuliani identified a yellow and black Nextel telephone belonging to Mario Reed that Guiliani had recovered in the house. (*Id.*, 231-32.) Giuliani also identified a box containing a throw rug, seven DNA swabs from blood found in the master bedroom and foyer, and two pairs of tennis shoes recovered from Mario Reed and Petitioner on the night of their arrests. (*Id.*, 232-33, 240.) Further, he took pictures of the victim's throat, where a knife point allegedly had been placed. (*Id.*, 250.)

Michigan State Police Crime Lab Fingerprint Examiner Tracee McIntosh testified that she found the fingerprints of Kevin Hill, Zoran Vezirovic and Mario Reed on the yellow paper containing the Monaco Street address. (Tr. III, 13-14.) She also testified that wearing gloves would prevent fingerprints from being left on objects. (*Id.*, 19.) Although the surfaces of the bat and the knife might have been conducive to prints, she was not given either the bat or the knife to examine for fingerprints. (*Id.*, 27-31.)

She testified that each agency decided which evidence to have tested. Neither budget nor time permitted testing every piece of evidence. (*Id.*, 49-50.) McIntosh stated that she had, on occasion, tested additional items requested by defense counsel. (*Id.*, 53.)

Bajram Anadoli was 17 years old at the time of his testimony. His mother was Ruka Anadoli, who was in a relationship with Zoran Vezirovic for seven or eight years, beginning in about 2000 or 2001. (*Id.*, 56-57.) During that period, Bajram, his brother Eman Anadoli, and his sister Espress Anadoli lived in his mother's house in Hamtramck with his mother and, between about 2001 and 2006, with Zoran Vezirovic, whom he called his father. (*Id.*, 57-59.) His mother and Zoran Vezirovic had a daughter (Jennifer or Jannetta), who was four or five at the time of trial. (*Id.*, 78-79.) They separated about two weeks after Bajram's birthday, August 16, 2006 or 2007. (*Id.*, 59-60, 78.) After his parents broke up, Jennifer lived with Ruka and the rest of the family in Hamtramck. (*Id.*, 78.) Vezirovic used to visit and take her overnight. (*Id.*, 78.) Ruka went to live in Sterling Heights with Asim Balcinovic, whom Bajram knew as Voka. (*Id.*, 60-61.)

On the night of August 16 to 17, 2007, Bajram and his girlfriend Cortney LaFlamme were staying at the Sterling Heights home, because the next day was Bajram's birthday. (*Id.*, 62-63, 80.) They were sleeping in the basement. (*Id.*, 63.) Bajram was awakened by a commotion and heard a person screaming and yelling that someone was in the house. (*Id.*, 82.) Bajram and Cortney ran upstairs. (*Id.*, 65. 81.) Bajram saw Petitioner on the floor of his mom's bedroom, between the closet and the bed. Asim Balcinovic was on top of Petitioner, telling him not to move. (*Id.*, 65-66, 83.) Asim's daughter called the police. (*Id.*, 65-66.) Asim threw the knife on the floor. He then told Bajram and his mother to get out of the room, and Bajram went to the kitchen. Bajram's mother had a red nose and he saw blood. (*Id.*, 110.)

The next thing Bajram knew, Petitioner was trying to get away.  Bajram ran toward the front door, and Petitioner slipped and hit his head.  Asim came and grabbed Petitioner and held him on the floor.  (*Id.*, 85.) Bajram identified the baseball bat as one that belonged to him, which he had placed behind the seat in Vezirovic's GMC Envoy a year or two earlier, when he lived in Hamtramck.  (*Id.*, 75-77.)  Bajram routinely saw the bat when he cleaned the Envoy every month or two, up until about two to four months before the assault.  (*Id.*, 90-91.)  He saw the bat again on the bed in the bedroom and later, after the police arrived, on the sofa in the living room.  (*Id.*, 75-77, 86.)

Bajram had seen Petitioner on two prior occasions.  The first time was about six months earlier at the Bosnian club located at Harper and 15 Mile Roads, which Zoran Vezirovic owns.  The second time was on August 15, 2007 at the Bosnian club, where Petitioner was in the company of Bajram's father, Zoran Vezirovic.  (*Id.*, 67-69.)  On the second occasion, Bajram had gone with Cortney to visit his father.  He saw Petitioner and Mario Reed pull up at the club in a silver car, and Vezirovic pulled up shortly thereafter.  After meeting inside, Vezirovic took Petitioner and Hill outside.  Vezirovic told Bajram to stay inside the club.  (*Id.*, 70-71.)  Bajram saw all three get into Vezirovic's GMC Envoy.  (*Id.*, 72.) Bajram waited for his father to come back.  (*Id.*, 73.)  When his father came back after about 20 or 30 minutes, Bajram asked him what he was doing with those kids, and Vezirovic responded that he had some business in Hamtramck with an Albanian guy.  (*Id.*, 74, 93.)

Bajram's girlfriend, Cortney LaFlamme, testified that she was at Bajram's mother's house in Sterling Heights the night of the assault.  Also present were Bajram's mother Ruka Anadoli, his sister Jenita, Asim Basinovic, Asim's daughters Mevlida and Asra, and Asim's son Elvis.  (*Id.*, 124-25.)  She later reconsidered her statement, saying that Jenita was not there.  (*Id.*, 148.)  Cortney identified Petitioner

and testified substantially similarly to Bajram about the events of August 17, 2007. (*Id.*, 125- 132, .)

Cortney, however, added that she saw Petitioner punch Ruka in the face when he ran from the bedroom

toward the front door. (*Id.*, 130.) She also confirmed that she had previously seen Petitioner and Mario

Reed at the American Bosnian Sports Club when they were visiting Bajram's father, Zoran. (*Id.*, 132-

136.)

   Melvina Balcinovic also woke up to the noise. Her mother came into the room and told

her to call the police, which she did. (*Id.*, 152-53.) She was talking to police while standing outside her

parents' bedroom. She saw a black man being held against the wall by her father Asim. Asim asked the

man who had sent him. (*Id.*, 154-55.) The man said, "[D]on't call the police." He then said that he had

the wrong house and was after the man next door. (*Id.*, 164-65.) Melvina went to the kitchen with Elvis,

Bajram, and Cortney. (*Id.*, 155-56.) She then saw the man run past them toward the front door, with

Asim right behind him. (*Id.*, 157.) She then went outside to wait for the police, telling them when they

arrived that there was a man inside. (*Id.*, 158.)

   Mario Reed testified that he had been a student and an employee of Comcast. (Tr. IV,

12.) As a result of his involvement in the events of August 17, 2007, Reed originally was charged with

life offenses, but he pleaded guilty to assault with intent to do great bodily harm less than murder and first-

degree home invasion, crimes for which the sentencing guidelines would have exposed him to a minimum

sentence of 10½ to 17½ years. In exchange for his agreement to testify at his accomplices' trial, he was

promised a minimum sentence of 30 months, with the possibility of getting three months of boot camp and

probation with a tether. (*Id.*, 14-16, 49, 107.) Reed explained that he met Petitioner about a month before

the incident. (*Id.*, 19.) Reed denied that Petitioner lived with him, saying that Petitioner was homeless but

staying with someone in Reed's apartment complex. (*Id.*, 75, 86.) Through Petitioner, Reed met Zoran Vezirovic. Petitioner approached Reed about participating in an assault for pay. (*Id.*, 19.) On August 12 or 13, 2007, approximately a week before the crime, Reed drove with Petitioner in Reed's silver Impala to a cafe near 15 Mile Road and Harper. (*Id.*, 13, 20.) They met Vezirovic outside, and he told them to come inside and he would be with them in a minute. (*Id.*, 22.) While at the coffee shop, Reed met Vezirovic's son and the son's girlfriend. (*Id.*, 21-22.) After a few minutes, the three men stepped outside, and Vezirovic explained what he wanted done. (*Id.*, 23.)

Reed testified that Zoran Vezirovic was supposed to pay Reed and Petitioner $15,000.00 for committing the assaults. (*Id.*, 17-18, 112.) Vezirovic wanted the male occupant of the home to have his throat slashed, and he wanted the woman's legs broken. (*Id.*, 20, 36, 39.) Because Vezirovic spoke broken English, he also used hand gestures to show that he wanted the men to take a baseball bat to the woman's legs as they were over a table. (*Id.*, 24.) The second time they met Vezirovic, Vezirovic gave them a baseball bat, which he took from his Envoy, to use when they went into the house. (*Id.*, 25.) Reed indicated that, after his first meeting with Vezirovic, Reed and Petitioner communicated with Vezirovic on Reed's company cell phone. (*Id.*, 26-27.) Petitioner had a phone, but it was not operational. (*Id.*, 78.)

On August 15, 2007, Reed and Petitioner met with Vezirovic. (*Id.*, 28.) Petitioner used Reed's phone to make calls to Vezirovic, and they arranged to meet at a gas station and McDonald's at 15 Mile and Harper, where they were given the address to the Monaco Street home and the baseball bat. (*Id.*, 29-30.) Petitioner went to the passenger side of the Envoy and talked to Vezirovic for about five minutes. He came back with a piece of paper containing the address of the home. (*Id.*, 31-32.) They were supposed to make the attack that night, but Vezirovic called it off because his kids were there. (*Id.*,

30, 34.) Nevertheless, Reed and Petitioner drove to the house that night to scope it out. (*Id.*, 34.) On August 16, Reed worked until 8:00 or 9:00 p.m., after which he went home. (*Id.*, 27-28.) Petitioner knocked on his door about 30 minutes after he got home. (*Id.*, 28.) Petitioner had a knife with him, because he planned to slice the throat of the man at the house on Monaco Street. Petitioner told Reed that he had put duct tape on the handle because of fingerprints. (*Id.*, 36.) Petitioner took the knife with him when they got into Reed's Impala, carrying it up his sleeve. The bat was already in the car. (*Id.*, 37-38.) Petitioner again contacted Vezirovic on Reed's phone, and Vezirovic wanted the attack done that night. (*Id.*, 38.) Reed drove his silver Impala to the Monaco address, and he parked next door, behind a silver-white van. (*Id.*, 39.) As they had been instructed by Vezirovic, they waited in the car for two and one-half hours, until the man arrived home. (*Id.*, 40-41.) They got out of the car and went to the back door of the house. Petitioner was wearing a black ski mask, black clothing, and gloves. (*Id.*, 41-42.) The door did not open. Petitioner tried to jimmy it, but it still would not open, so they went to a window in the front of the house, which they found unlocked and open a crack. (*Id.*, 42-43.) Reed lifted Petitioner up so that he could get in the window. Reed handed the knife and the bat through the window to Petitioner. (*Id.*, 42-44, 71.) Reed was supposed to go in, too, but he could not go through with it. Reed returned to his car. (*Id.*, 43.) He was not in his car for more than three minutes when the police arrived. He attempted to drive off, but a police officer ran up and stopped him. (*Id.*, 43, 45.) Reed at first denied having anything to do with the crime. (*Id.*, 45-46.) At later interviews, while represented by counsel, Reed changed his story and ultimately pleaded guilty to the lesser charges. (*Id.*, 46.)

Ruka Anadoli testified through an interpreter. She identified Vezirovic as a man she had known and lived with for eight years and with whom she had one child, Jenita, who was six years old. (*Id.*,

115-17.) She had three older children, Anadoli Emer, who was 23, Anadoli Espress, who was 21, and Anadoli Bajram, who was 17. (*Id.*, 117.) When she moved out of the house in July 7, 2007, she took Jenita with her and went to Florida. She threatened not to let Vezirovic see Jenita, because he was theatening her. (*Id.*, 142-43.) She kept Jenita for two weeks, and then Petitioner took Jenita and did not bring her back for one and one-half months. (*Id.*, 119, 142.) In August 2007, Ruka lived with Asim Balcinovic. They were arguing over the phone during this period, both about Jenita and because Petitioner wanted Ruka back. (*Id.*, 145.) On August 2, 2007, she went to the Sterling Heights police station to report that Zoran Vezirovic had threatened her over the phone on August 1, saying the would come with a gun to kill her and the man she lived with. (*Id.*, 118, 120-21, 146.) He also threatened to kill Jenita. (*Id.*, 125.) Ruka and Asim went to the police in Hamtramck to get help in getting Jenita from Vezirovic. They then drove to Vezirovic's house, but he was not there. (*Id.*, 125-26.) Ruka called Vezirovic on her phone and told him that she was there, and he came. When he arrived, Vezirovic began yelling at her in Bosnian, because the police were there. (*Id.*, 126.) He said that it was written that she could not come and see the child, so she could not come. He threatened to have her sent to prison. (*Id.*, 127.) The police pulled them apart and then handed Ruka a court paper saying that she could not approach the house. She walked toward Asim, who was sitting in his car across the street. Vezirovic followed and went to the car's window. He said that he was going to kill her and the kids and that by Saturday, they would be dead. (*Id.*) Eventually, Azim got out of the car. Then the police came over and pulled Vezirovic away. Ruka explained to the police what Vezirovic had been saying, but they took no action. (*Id.*, 128.) Ruka did not get Jenita back until after the attack at Monaco Street. (*Id.*, 148.)

On the night of August 16 to 17, 2007, a number of people were at Asim Balcinovic's home: Asim's three children, Ruka's son and his girlfriend, and a friend of Ruka's. (*Id.*, 128.) Asim arrived home at about 3:30 a.m., and they had coffee in the living room. He commonly arrived that late, because he was a truck driver. Asim told her that he was going to sleep and went to the bedroom. She went to the kitchen to wash some dishes. (*Id.*, 128-29.) While she was there, she heard Asim say, "[W]ho are you? What are you doing in my house?" (*Id.*, 130.) Petitioner yelled, "I'm going to kill you." (*Id.*, 133.) She ran into the room and saw Asim holding Petitioner on the floor. (*Id.*, 131-32.) Petitioner then said that he had gone into the wrong house. Asim asked Ruka if she knew who Petitioner was. (*Id.*, 132.) He then told her to call the police. (*Id.*, 134.) Ruka called to Mevlida and told her to call the police. Ruka testified that she saw a knife on the floor and a baseball bat lying next to him. At this point, she and Mevlida and possibly Bajram and his girlfriend were in the corridor. (*Id.*, 135.) Petitioner pushed Asim and ran by Ruka, and she tried to stop Petitioner by grabbing his hand. Petitioner hit her twice in her nose, causing it to start bleeding. (*Id.*, 136, 138.) Then Asim ran after Petitioner. She could not see what was happening for a bit, because she went into the bathroom to get a tissue for her nose. (*Id.*) She touched the bedroom window to close it. (*Id.*, 139.) When she subsequently walked down the corridor, she saw Asim holding Petitioner down with his hands. When the police arrived, they took Petitioner away. (*Id.*, 136.) While Asim was holding Petitioner on the floor, she saw the ski hat on the floor. (*Id.*, 137.) Ruka identified pictures of the knife, hat and gloves and testified that she had never seen them before that night. (*Id.*, 137.)

Asim Balcinovic testified, through an interpreter, that he was a 39-year-old truck driver. He had been in a relationship with his wife, Ruka Anadoli, since July 2, 2007. On August 17, 2007, he,

-13-

Ruka, his three children and Ruka's son were all living at the Monaco Street house. (*Id.*, 169.) He went to Hamtramck once with Ruka, when she was trying to see her daughter, Jenita. (*Id.*, 170.) Ruka stood outside the house, but Asim remained parked across the street at the gas station. (*Id.*, 171.) The police gave Ruka a personal protection order and told her that she could not see her child and that she would have to go to Wayne County to prove that she was the mother. (*Id.*, 171.) When Ruka came back to the car, Vezirovic followed her. He came to Asim's window and told Asim that he was going to kill him and his children before Saturday. (*Id.*) Asim told Vezirovic that he did not have the courage to do so. Asim got out of the car, and Vezirovic swore at Asim, referencing Asim's mother. Asim told the police what had been said, but they did nothing. They just pointed Vezirovic to his house, and Asim and Ruka left. (*Id.*, 172.)

Asim explained that he had been working a 5:00 p.m. to 3:00 a.m. shift for about a year before the incident. His custom was to come home, watch CNN and drink coffee and eat something before bed. That night, he spent about 45 minutes or an hour with Ruka before going to the bedroom. (*Id.*, 173.) Ruka stayed in the kitchen to wash dishes. When Asim was walking through the hallway, something told him to open the closet door of his bedroom. When he did, he saw a black man dressed in black, who grabbed him and pointed a knife at his neck. (*Id.*, 174.) Asim identified the man as Petitioner. (*Id.*, 178.) The man said, "I'm going to kill you." (*Id.*, 176.) Using his right hand, Asim grabbed the Petitioner's hand and pushed the knife aside. Using his left hand, he grabbed Petitioner by the neck and pushed him down. Asim demonstrated the movements with the prosecutor, who described them for the record without objection. (*Id.*, 177.) Although he did not feel it at the time, the knife left a small scratch on Asim's throat. (*Id.*, 178.) Also, as Asim pushed the knife away, he struck his knuckles into the closet

door.  (Tr. V, 10.)  Asim held Petitioner down on the floor.  Petitioner pleaded with Asim to let him go, saying that he had broken his hip.  Asim eased up a bit and asked Petitioner who had sent him and why was he in Asim's room.  (*Id.*, 12.)  Asim took the mask, which was in Petitioner's hand.  (*Id.*, 15.) Petitioner said that he really meant to go to Asim's neighbor's house to kill his neighbor because the neighbor had killed his mother.  Asim, who knew his elderly neighbors, told Petitioner that he was lying. Then Petitioner said that he was killing someone who had a black vehicle.  Asim drove a black Malibu. Asim asked again who had sent Petitioner.  (*Id.*, 13.)  At that point, Bajram came into the room, and Petitioner said that he knew Bajram.  Asim turned toward Ruka and asked if she had called the police. When Asim, turned, Petitioner managed to push Asim aside, get up, and run away.  (*Id.*, 14.)  Petitioner ran between Ruka and Mevlida at the door.  Ruka grabbed Petitioner by the hand to hold him, and Petitioner turned quickly and hit Ruka with his fist, causing her to bleed.  Petitioner left the bat and knife in the room.  (*Id.*, 14-15.)  Asim chased Petitioner and managed to grab him by the neck just before he got to the foyer.  Asim pushed him down, and the man slipped on the hardwood floor and hit himself on the door as he fell to the floor.  (*Id.*, 16.)  Asim then grabbed Petitioner and held him on the floor until the police arrived.  (*Id.*, 18.)  Asim identified Vezirovic for the jury.  (*Id.*, 21.)

Sterling Heights Police Detective Jason Bisdorf was the officer in charge of the case.  (*Id.*, 36.)  He arrived at the Monaco Street address at about 7:00 a.m. on August 17, 2007.  Officers were already on scene, and Officer Giuliani had arrived to process the evidence.  (*Id.*, 38.)  Bisdorf testified that he saw no blood in the bedroom, but saw blood near the front door on both the door frame and the wall. (*Id.*, 40.)  Because they had the intruder in custody and there was no question of identity, Bisdorf determined that there was no need to take fingerprints from the knife.  (*Id.*, 40-41.)  He did, however, have

the bat sent to the crime lab for DNA purposes.  According to the report of forensic examinder Melinda Jackson, no blood was found on the bat.  The report was admitted by prior stipulation of the parties.  (*Id.*, 41-42.)  Bisdorf confirmed that he had established that Petitioner's phone, which had been recovered at the scene, was not working.  (*Id.*, 43.)  However, Bisdorf pulled a search warrant for the records of the Nextel phone belonging to Mario Reed.  In addition, when Vezirovic was arrested, his phone was confiscated.  Bisdorf was able to determine from the phone numbers on Reed's phone that calls had been made between Reed's phone and Vezirovic's phone.  (*Id.*, 44-45.)  Those calls began on August 12, 2007 and ended on August 17, 2007, including calls on August 15, 16 and 17.  (*Id.*, 46-47.)  The phone records of both Reed's and Vezirovic's phones, which comprised many pages, were admitted by stipulation.  (*Id.*, 45-47.)  Bisdorf was cross-examined on the basis of the hospital release form, which indicated that Petitioner had received ten staples to the back of his head to repair an injury caused by a direct blow.  A baseball bat was noted.  (*Id.*, 57-58.)  On redirect, however the witness stated that the medical reports were based on Petitioner's statements to the medical providers.  (*Id.*, 69.)  The injury was strictly to soft tissue.  (*Id.*, 70.)  The prosecutor rested his case.  He also formally amended the information to include the following four counts:  (1) first-degree home invasion with intent to commit murder; (2) assault with intent to commit murder; (3) conspiracy to commit first-degree murder; and (4) conspiracy with intent to do great bodily harm less than murder.  (*Id.*, 76-78, 148-49.)

Petitioner's mother Arlicia Hill testified that Petitioner was 19 years old and in the eleventh grade, but he had been in special education since the eighth grade, as he was a very slow learner.  (*Id.*, 100-01.)  According to Arlicia Hill, Petitioner had been sharing an apartment with Mario Reed for about one month at the time of the assault.  Petitioner told Ms. Hill that she would be proud because he found

someone with an education to be friends with. (*Id.*, 102.) She testified that Petitioner was very impressionable and easy to mislead. (*Id.*, 104.) Petitioner elected not to testify. (*Id.*, 105.)

Zoran Vezirovic testified that he was 46 years old and had been in the United States since September 19, 1999. (*Id.*, 109-10.) He moved to Michigan on August 6, 2000. Vezirovic lived with Ruka Anadoli in Hamtramck, and they spoke only Bosnian at home. They had a child, Jenita or Jennifer, who was born in 2001. They lived in a two-story house with Ruka's three children, their child, and the wife and child of one of Ruka's sons until July of 2007. (*Id.*, 111-12, 114.) Bajram was nine or ten when they first moved in together. Vezirovic worked at Warren Industries from August 19, 2000, until he was taken to jail. (*Id.*, 113.) Vezirovic testified that he owned the Bosnian social club. His son Bajram and Bajram's girlfriend worked there, as did Svetlana or Sveta. However, Sveta, Ruka and Asim allegedly stole Vezirovic's poker machines. (*Id.*, 113.)

When Vezirovic and Ruka broke up, Ruka took Jenita to the coast. She told Vezirovic that she was going up north with a friend and was planning to go to Canada. (*Id.*, 115.) Ruka's son subsequently called Vezirovic and told him that he should not try to contact Ruka, as she had gotten married. Vezirovic called Ruka every day for 14 days, so that he could speak with Jenita, but Ruka only allowed it twice. (*Id.*) Vezirovic sought a personal protection order, which he was supposed to serve on Ruka at her home; instead, he served her with the papers when Ruka and Asim came to his house. The yellow piece of paper found in Reed's car was what Vezirovic brought to the police department when he got the personal protection order. (*Id.*, 116.) He did not know what had happened to that paper until he came to the court. (*Id.*, 117.) The baseball bat did not belong to Vezirovic, and the car it was in had been used by Ruka until July 2, 2007. When Ruka got married, Vezirovic began to use the car. Vezirovic

testified that the car had many things in it, and he did not even know that the baseball bat was there. (*Id.*, 118.) Vezirovic denied threatening either Ruka or Asim, and he said that Jenita was his heart and soul, whom he would never hurt. (*Id.*, 119.)

Vezirovic testified that he met Petitioner at his bar on 15 Mile and Harper. His friend Victor had called to tell him that there was a person who needed a job. Petitioner called and Vezirovic testified that he went to pick up Petitioner to talk to him about the job, taking a friend along to translate. (*Id.*, 119-20.) According to Vezirovic, Bajram said that Petitioner was a friend of his. (*Id.*, 120.) Vezirovic had never met Reed until he came to the Bosnian social club with Petitioner. Vezirovic invited Reed and Petitioner into the bar for a drink. Vezirovic did not have a liquor license, but he still served alcoholic beverages to some people. But when he saw that Reed was drinking a big bottle of beer, Vezirovic did not want them to be in front, so he invited them into his car. (*Id.*, 121-22.) Because Petitioner had asked for $5.00 for gas and because Vezirovic needed cigarettes, Vezirovic showed Petitioner and Reed where the gas station was. Petitioner rode with Vezirovic, and Reed drove his own car. When Vezirovic got change from his cigarette purchase, he gave Reed $10.00 for gas. Vezirovic testified that he always gave people money when they needed it. That was the only occasion on which he saw Reed, and it only lasted five minutes. (*Id.*, 123-24.) He denied discussing killing anyone and said the idea was foolish, especially because he did not know Reed. Vezirovic believed that Svetlana, who was Ruka's friend, had stolen his poker machines, and that Ruka and Asim were part of it. (*Id.*, 124.) Vezirovic testified that he only met Petitioner three or four days before the incident, and he could not explain the calls originating from Mario Reed's phone prior to that time. (*Id.*, 138, 140.)

-18-

Following oral arguments and jury instructions, the jury deliberated for two full days before returning with a verdict. During that period, the jury sent numerous questions and requested specific exhibits. The jury found Petitioner guilty of assault with intent to commit murder, but not guilty of the other three charges.[3]  (Tr. VII, 12-14.)  On July 17, 2008, Petitioner was sentenced to a prison term of 12 to 20 years, with credit of 335 days for time served.

Petitioner appealed his conviction to the Michigan Court of Appeals, raising two issues. First, he contended that trial counsel was ineffective in not conducting a thorough investigation, specifically, not requesting that the baseball bat and knife be analyzed for latent prints. Second, he argued that the trial court created an atmosphere conducive to hasty deliberations by giving an *Allen* instruction[4] and by refusing to excuse two jurors for personal reasons after the trial went longer than expected. In an unpublished opinion issued on February 16, 2010, the court of appeals denied all appellate grounds and affirmed the conviction. (2/16/10 Mich. Ct. App. (MCOA) Op., ECF No. 34.)  Petitioner raised the same two grounds in his application for leave to appeal to the Michigan Supreme Court, together with a new claim of ineffective assistance of appellate counsel. In an order dated June 28, 2010, the supreme court denied leave to appeal, because it was not persuaded that the questions presented should be reviewed by the court. (Mich. Ord., ECF No. 35.)  Petitioner sought reconsideration in the Michigan Supreme Court, which was denied on the merits on November 22, 2010.

---

[3]The jury found Vezirovic guilty of conspiracy to commit first-degree murder of Asim Balcinovic and guilty of conspiracy with intent to commit great bodily harm less than death of Ruka Anadoli. The jury, however, found Vezirovic not guilty of solicitation of murder of Petitioner and/or Mario Reed and not guilty of solicitation to commit assault with intent to do great bodily harm less than murder. (Tr. V, 75-76.)

[4]*Allen v. United States*, 164 U.S. 492 (1896) (discussing the type of charge that may be  given to an apparently deadlocked jury to encourage further deliberations without being coercive).

On March 25, 2011, Petitioner filed a motion for relief from judgment in the Macomb County Circuit Court.  In his motion, Petitioner raised the first seven issues presented in his habeas petition. (Br. in Supp. of Mot. for Relief from J., ECF No. 38.)  The trial court concluded that Petitioner failed to demonstrate good cause for not presenting his issues on direct appeal, because appellate counsel was not ineffective in declining to raise meritless claims.  (10/12/11 Cir. Ct. Op. & Ord., ECF No. 40.)

Petitioner filed an application for leave to appeal to both the Michigan Court of Appeals, raising the same seven issues.  The court of appeals denied leave to appeal on September 7, 2012.  (7/2/12 MCOA Ord., ECF No. 36.)  Petitioner sought leave to appeal to the Michigan Supreme Court, raising those seven issues, together with his eighth habeas ground.  The supreme court denied leave to appeal on March 4, 2013.  (3/4/13 Mich. Ord., ECF No. 37.)

In his habeas application, Petitioner raises all eight issues presented to and rejected by the Michigan Supreme Court on collateral review.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S.

86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

I.  Grounds I & II: Denial of Due Process and Sixth Amendment Right to Impartial Jury Based on Juror and Judge Being Privy to Negative Information that Prejudiced Petitioner

In his first ground for habeas relief, Petitioner argues that he was deprived of due process when a prospective juror indicated during voir dire that he was privy to information about the case that caused him to have a negative view of Petitioner. In Ground II of his habeas application, Petitioner argues that, based on the same course of discussion, that the trial judge admitted that she had discussed the case with outside sources before the trial ensued, depriving Petitioner of an unbiased judge. Petitioner also argues that trial counsel was ineffective for failing to object to the errors. Both errors allegedly arose out of a brief exchange between Juror Number 135, in seat number 10 (referenced in the trial court record as Juror No. 10), which occurred in the presence of the rest of the jury pool:

-22-

JUROR NO. 10:  I know several attorneys and various police officers of various jurisdictions.

THE COURT:  Is that through the work you might do?

JUROR NO. 10:  No.  Friends, associates, schoolmates.

THE COURT:  Any of them that are involved in the criminal system in terms of either prosecutors or defense attorneys?

JUROR NO. 10:  I knew an attorney that works for – actually he's going to be taking the bar here shortly for York, Dillon and Tomlinson.  I believe that they do work for a lot of municipalities around Macomb County.

THE COURT:  They are some municipal clients.

Is there anything about your friendship with the attorneys that you know that would [a]ffect your ability to be [] fair and impartial in this criminal case?

JUROR NO. 10:  I believe that I know a lot more about the case here than what's been offered in this court.

THE COURT:  And under what circumstances would that be?

JUROR NO. 10:  I think if I answered that i[t] might be unfair to the defendants rights now.

THE COURT:  The information that you would have, how is that glea[n]ed.

JUROR NO. 10:  I'm sorry?

THE COURT:  The information that you have, without – you know what, ladies and gentlemen, why don't we do this.  It's 20 minutes to 11:00.  Why don't we take a break. I know a lot of you would like to use the restroom.  We'll break for fifteen minutes.  Wait outside the courtroom and then we'll continue jury selection.  And if you [referring to Juror No. 10] would remain in for a couple of minutes.

(Tr. II, 71-72.)  The court then continued its examination of Juror No. 10 outside the presence of the rest

of the jury pool.  During that subsequent discussion, Juror No. 10 disclosed that he had conversation with

attorneys about the case, well before he knew that he was going to be in the jury pool. (*Id.*, 72-73.) In response, the court commented:

> THE COURT: . . . I play golf with attorneys, police officers. And we talk about it and some of the things that they've done or some of the things that officers that they know have been involved in. . .

(*Id.*, 73.) The court inquired further of the potential juror, who disclosed that none of those who talked to him gave him were involved in the case, but indicated that he had discussions of some of the facts and circumstances and believed that he had formed opinions about the case that were not favorable to the defendants. (*Id.*, 74-77.) The court excused Juror No. 10 for cause. When the other jurors were returned, the court said nothing more than that Juror No. 10 had been excused. (*Id.*, 78.)

Petitioner complains that, by indicating that he did not want to be unfair to the defendants, Juror No. 10 prejudiced the remainder of the jury and deprived Petitioner of his Sixth Amendment right to an impartial jury. He also alleges that the judge disclosed that she had independent information about the case that amounted to bias depriving Petitioner of his right to due process.

The trial court rejected the two claims as meritless:

> The Court will first address Defendant's argument that he was deprived of a fair trial based upon the impartiality of this Court and by a potential juror during voir dire. Disqualification of a judge is governed by MCR 2.003, which provides in pertinent part:
>
> > (1)     Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:
> >
> > > (a)     The judge is biased or prejudiced for or against a party or attorney.
> > >
> > > (b)     the judge, based on objective and reasonable perceptions, has either (I) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v. Massey*, [566] US

[868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

(c)     the judge as personal knowledge of disputed evidentiary facts concerning the proceeding.

In this case, the Court did not have personal knowledge of any evidentiary facts, and merely presided over the proceedings. Therefore, appellate counsel's failure to raise this issue on appeal is not a basis for relief from judgment because the issue is without merit. The same is true for Defendant's argument regarding the impartiality of the jury. This issue is without merit, and in addition, was waived by trial counsel's pronouncement that the jury was satisfactory. See *People v. Carter*, 462 Mich 206, 216; 612 NW2d 144 (2000). Consequently, Defendant's motion for relief from judgment based upon these arguments should be denied.

(10/12/11 Cir. Ct. Ord., 4, ECF No. 40.)

## A.     Denial of Impartial Jury

Petitioner's constitutional claim of juror bias is based on an assertion that the jury was influenced by improper extrinsic evidence, in violation of *People v. Budzyn*, 556 N.W.2d 229, 234-35 (Mich. 1997) (citing *People v. Tyburski*, 518 N.W.2d 441, 447 (Mich. 1994) (reiterating the well estblished constitutional right to a fair and impartial jury, and citing *Duncan v. Louisiana*, 391 U.S. 145 (1968)). In *Budzyn*, the Michigan Supreme Court discussed the standard applied to situations in which the jury has been exposed to "extraneous facts not introduced in evidence," recognizing that such facts "deprive[] a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment." 556 N.W.2d at 235 (citing *Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir. 1990).).

Contrary to Petitioner's argument, the issue in the instant case does not involve the jury's unauthorized exposure to facts not in evidence. Rather, Petitioner merely complains that, as a result of a

-25-

response of a juror who was excused from the jury, the entire jury pool was tainted. The Sixth Amendment guarantees an accused the right to be tried "by an impartial jury." U.S. Const. amend VI. *See Irvin v. Dowd*, 366 U.S. 717, 723 ((1961) (describing the standard as the right to be tried before "a panel of impartial, 'indifferent' jurors"). "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. . . . To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Id.* at 722-723. As the Supreme Court has explained, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. Moreover, any claim that a jury was not impartial must focus only on the jurors who ultimately sat on the case, not on those who were excused. *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). Finally, as the Sixth Circuit has recognized, there exists a "well-established presumption of juror impartiality, *see Irvin*, 366 U.S. at 723, as well as the equally important presumption that jurors followed the trial court's instructions, *United States v. Tines*, 70 F.3d 891, 898 (6th Cir. 1995)." *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006).

Petitioner has presented no evidence of actual juror bias to overcome the presumption that the jury was impartial. *Id.* (citing *Irvin*, 366 U.S. at 723; *United States v. Jobe*, 101 F.3d 1046, 1048 (5th Cir. 1996)). He merely argues that the potential juror's limited reference to not wanting to say anything that would prejudice Petitioner was inherently prejudicial. In *Guzman*, however, the Sixth Circuit expressly held that such a generalized argument that the jury venire had been "indoctrinate[d]" by a single juror's

expression of prejudice was insufficient to overcome the presumption of jury impartiality. *Guzman*, 450 F.3d at 629-30. Other courts have similarly concluded that the presumption of impartiality of unexcused jurors is not undermined when an excused, potential juror announces his potential bias. *See United States v. Olaseinda*, No. 96-4576, 1997 WL 253020, at *1, 1997 U.S. App. LEXIS 11365, at *2-3 (4th Cir. May 15, 1997) (per curiam) (rejecting defendant's argument that the entire venire was contaminated by a prospective juror's statement, based on her experiences as a juror in other cases, that a defendant on trial is probably guilty); *United States v. Buchanan*, 787 F.2d 477, 480 (10th Cir.1986) (affirming a district court's refusal to dismiss the entire venire after hearing statements from one potential juror that he may not be able to remain impartial because his home had recently been vandalized), *overruled in part on other grounds by United States v. Welch*, 928 F.2d 915 (10th Cir. 1991); *United States v. Jones*, 696 F.2d 479, 491-92 (7th Cir. 1982) (finding no error in a district court's decision not to dismiss any other juror after one potential juror stated that a defendant's decision not to testify may affect his judgment as to guilt, and another potential juror stated that a newspaper report would likely affect his judgment).

Here, the content of the statement made by the potential juror was extremely vague. The juror indicated only that he did not want to prejudice the defendants. All other comments were taken outside the presence of the jury venire. In addition, all jurors agreed that they could be impartial. Further, the judge repeatedly instructed the jurors about what constituted evidence and the jury's duty to decide the case solely on the evidence introduced in the case. (Tr. II, 112-117; Tr. VI, 9-13.)

Under all of these circumstances, Petitioner's claim that the jury was tainted falls far short of demonstrating a constitutional violation. The state court's rejection of the claims constituted an entirely reasonable application of clearly established Supreme Court precedent.[5]

### B.    Judicial Bias

Petitioner's related claim that the judge was biased is even less compelling. In talking to Juror No. 10 outside the presence of the other jurors, the judge indicated that she occasionally had casual discussions about unspecified cases with attorneys and police officers.

To the extent that Petitioner complains that the court violated MICH. CT. R. 2.003(B) or Canon 3(E) of the Michigan Code of Judicial Conduct, he fails to state a claim that is cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law,

---

[5]The Court notes that all of Petitioner's habeas grounds were raised for the first time in his motion for relief from judgment, rather than on direct appeal, as typically required by Michigan law. In addition, many of the claims were not subject to a contemporaneous objection, which also is required for appellate review in Michigan. "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010). Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Petitioner argues that the ineffective assistance of trial and appellate counsel serve as cause excusing his defaults. Where, as here, the procedural default issues raise more questions than the case on the merits, the Court will proceed to the merits of the claims without deciding the issues involved in the procedural defaults. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76); *see also Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

In addition, to the extent that Petitioner intends to raise a constitutional claim, his allegations fall short of demonstrating a violation of the Due Process Clause. "[D]ue process demands that the judge be unbiased." *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of *actual* bias in the trial of cases." (emphasis added)). In addition, a judge can and should be disqualified for "bias, [ ] a likelihood of bias[,] or [even] an appearance of bias." *See Ungar v. Sarafite*, 376 U.S. 575, 588 (1964); *see also Murchison*, 349 U.S. at 136 ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."); *accord Railey v. Webb*, 540 F.3d 393, 399-400 (6th Cir. 2008); *Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) (opining that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias").

However, "most matters relating to judicial disqualification d[o] not rise to a constitutional level." *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) ("All questions of judicial qualification may not involve constitutional validity."); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause . . . establishes a constitutional floor, not a uniform standard. Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar."). As the Court has reiterated on multiple occasions, "[p]ersonal bias or prejudice 'alone would not be sufficient basis for imposing a

-29-

constitutional requirement under the Due Process Clause.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 566 U.S. 868, 876-77 (2009) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986)).   In only three types of cases has the Supreme Court actually held that something less than actual bias violates constitutional due process:  (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. 523 (subsequently expanded to include even indirect pecuniary interest);  (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor); and (3) when, "based on objective and reasonable perceptions," . . . "a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent," *Caperton*, 566 U.S. at 884.

Petitioner's claim of judicial bias implicates none of these three concerns.   At best, Petitioner alleges mere personal bias by the judge, which alone does not violate a constitutional standard.  *Caperton*, 566 U.S. at 876-77; *Lavoie*, 475 U.S. at 822.   In fact, Petitioner does not even successfully demonstrate personal bias, as the comment he references does not suggest that the trial judge had independent information about or a pre-formed opinion of Petitioner's case.   And, in denying relief from judgment, the trial judge expressly stated that she had no personal knowledge of the case.  (10/12/11 Cir. Ct. Op. & Ord., 4, ECF No. 40.)  On these facts, Petitioner cannot demonstrate constitutional error, much less that the state court's rejection of his claim was contrary to or an unreasonable application of clearly established Supreme Court precedent.

## C.    Ineffective Assistance of Counsel – Failure to Object

Petitioner contends that defense counsel was ineffective in failing to object to the jury's and the judge's bias.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.  Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable

argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

   As the Court previously has discussed, Petitioner has failed to demonstrate that he was deprived of an impartial jury or that the trial judge was biased in violation of the Due Process Clause. As a consequence, any objection would have been futile. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

II.  <u>Ground III: Prosecutorial Misconduct</u>

   In his third ground for habeas relief, Petitioner argues that the prosecutor committed misconduct, thereby depriving Petitioner of a fair trial. Specifically, Petitioner contends that the prosecutor mischaracterized the evidence to support his arguments; vouched in his opening statement for Reed's credibility; degraded the defense witnesses; and improperly referred to Reed as a co-defendant and co-conspirator. Petitioner also argues that his attorney was ineffective in failing to object to the prosecutor's misconduct.

   In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he

-32-

touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith*, 455 U.S. at 219. In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

After outlining the correct constitutional standard, the trial court addressed Petitioner's specific claims as follows:

Defendant first argues that the prosecutor committed misconduct by mischaracterizing the evidence of why duct tape was placed on the knife utilized and found at the scene. Defendant argues that trial counsel should have objected based upon the fact that the duct tape could have been needed to hold the handle on the knife. However, the testimony presented by Reed indicated that Defendant told Reed that he put the duct tape on the knife because of fingerprints. Consequently, the prosecutor's remarks were supported by the evidence presented. Defendant also argues that the prosecutor improperly vouched for the credibility of a witness, and degraded Defendant's witnesses. However, the alleged improper statements, taken in proper context, do not amount to improper vouching for a witness, and therefore did not deny Defendant a fair trial. Defendant further argues that the prosecutor committed misconduct by referring to Mr. Reed as "co-defendant" and "co-conspirat[."] However, trial counsel objected, and the Court affirmed the objection, requiring Mr. Reed to be referred to as the "alleged co-conspirator[."] The statements therefore were cured, did not amount to evidence, and did not deny Defendant a fair trial given the not guilty verdict for the conspiracy charges and the weight of the evidence presented against Defendant. Therefore, trial counsel and appellate counsel did not deprive Defendant of his right to effective assistance of counsel. Consequently, Defendant's motion for relief from judgment based upon prosecutorial misconduct should be denied.

(10/12/11 Cir. Ct. Ord., 6, ECF No. 40.)

The trial court's conclusions were patently reasonable. First, as outlined in the recitation of facts, Reed unquestionably testified that Petitioner had told him that he had used duct tape in an attempt to avoid fingerprints. Petitioner's argument that no evidence supported the prosecutor's claim that Ruka Anadoli was hit twice in the face is frivolous. As previously outlined in the statement of facts, Ruka Anadoli herself testified that Petitioner punched her twice in the nose. (Tr. IV, 136.)

Second, any reference to Mr. Reed as a co-conspirator or co-defendant was of minimal prejudicial impact, given that Reed himself testified that he conspired with Petitioner and Vezirovic. Moreover, as the trial court noted, any prejudice was cured when the court sustained defense counsel's objection to the prosecutor's statements.

-34-

Third, Petitioner fails to demonstrate that the prosecutor impermissibly vouched for Reed. The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see  Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).[6]

Here, the prosecutor's remarks did not amount to improper bolstering of either type recognized by the Sixth Circuit. Instead, the prosecutor outlined for the jury what he expected the evidence to show. First, he stated that, based on the statement already read to the jury about Reed's plea deal, the

---

[6]The Court observes that, notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see  Wogenstahl*, 668 F.3d at 328-29 (citing *Johnson v. Bell*, 525 F.2d 466, 482 (6th Cir. 2008)), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct. Given the Supreme Court's recent admonitions to the courts regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation. *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 3 (2014) (holding, with respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *White*, 134 S. Ct. at, 1703 (same, respecting a claim regarding the privilege against self-incrimination); *Parker*, 132 S. Ct. at 2155 ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

prosecutor noted that Reed's plea agreement was dependent on his "complete and truthful testimony." (Tr. II, 151.) Petitioner conveniently fails to note the following sentence, in which the prosecutor stated, "Well, ultimately you guys decide what is complete and truthful. You are still the judges of the fact." (*Id.*, 151.) In other words, the prosecutor did no more than advise what the evidence would show – conduct that is wholly permissible. *See Hanna v. Price*, 245 F. App'x 538, 545-46 (6th Cir. 2007) (holding that a prosecutor is free to argue inferences drawn from the evidence); *Bates v. Bell*, 457 F.3d 501, 525 (6th Cir. 2006).

Fourth, Petitioner fails to demonstrate that the prosecutor committed misconduct in his closing argument. Petitioner contends that the prosecutor denigrated his defense in the bolded portions of the following passage:

> **The bottom line is Zoran Vezirovic wants you to believe that he never did anything with [Petitioner] other than try to get him a job.** He never requested him to hurt anybody. And he never even really had any conversations with Mario Reed, despite the phone records and all of that that in hindsight are able to disprove his testimony, to attack his credibility, and the evidence in this case clearly, **I would argue to you, ladies and gentlemen, that evidence established that he was just outright lying.**
>
> At the beginning of this case in voir dire we talked about if you believe only one person you can base your entire conviction on that. I mentioned it in my opening that not only do we not have just one person, in other words, we do have that one person but there is so much more to this case, the several people that testified as to what happened in that house and what [Petitioner] was doing in that house that bolster, absolutely corroborated what Mario Reed was explaining to you. Because, again, Mario Reed told you about the agreements before, the people told you about what happened in the house, and then the exhibits confirm[] everything, the photographs, the phone records, the fingerprints on the pieces of paper, the lack of DNA or blood on that bat. In other words, there was no hitting of the baseball bat or breaking somebody's head open. All that shows you, ladies and gentlemen, is that each and every element of these crimes were proved, that the verdict – if you look, a careful and considered look at all the testimony is guilty of each and every charge that these two defendants are charged with, **and that the defense that Mr.**

> **Vezirovic came up to you and said I didn't have anything to do with those is just outright lies.**

(Tr. V, 168-69 (emphasis added).)

A prosecutor is free to argue from the evidence that certain defense witnesses are lying, but may not denigrate the defense or defense counsel. *See Hanna*, 245 F. App'x at 545-46; *Bates*, 457 F.3d at 525. Moreover, not every aspersion cast by a prosecutor upon a defense attorney's presentation of a case requires reversal of the guilty verdict. *See*, 470 U.S. at 11 (stating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial"). "A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992); *see also Brown*, 231 Fed. Appx. at 480 (a prosecutor's isolated comments in closing argument that the defense was attempting to trick the jury is not an improper disparagement of defense counsel). Here, while he used the words "lying" and "lies," the prosecutor did so only as part of an argument as to what the jury should conclude based on the evidence. In context, the prosecutor's statements did not denigrate the defense and were not improper. Moreover, any improper suggestion was cured by the court's repeated instructions to the jury that the attorneys' arguments were not evidence. (Tr. II, 114; Tr. VI, 9.)

Finally, the prosecutor did not commit misconduct by introducing Reed's guilty plea, notwithstanding Petitioner's argument that the information about the plea allowed the jury to find Petitioner guilty vicariously, through his association with Reed. The argument is specious. Evidence of Reed's plea

-37-

agreement was essential to both defendants' ability to challenge Reed's credibility. *See Napue v. Illinois*, 360 U.S. 264 (1959) (recognizing that a jury ordinarily must be told of the benefits an accomplice has obtained in exchange for his testimony and finding constitutional error where the prosecutor did not correct a witness' misrepresentation of those benefits). Obviously, both defendant's attorneys recognized the importance of the plea agreement to their cross-examination of Reed, as they stipulated to the admission of the agreement. (Tr. I, 133-34.) And both defense attorneys' cross-examined Reed concerning the lies he had told the police before entering his plea and the benefits he had obtained in exchange for that testimony, including the reduction of his potential sentence from life imprisonment to a minimum of 30 months. (Tr. IV, 48-50, 94-95, 107.) By showing the jury the substantial benefit Reed obtained by pleading guilty were the Defendants able to suggest his motivation for lying. *Napue*, 360 U.S. at 270. Moreover, because the evidence was admitted at trial and stipulated to by defense counsel, Petitioner cannot demonstrate that the prosecutor committed misconduct. *See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 1999) ("'A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings.'") (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008)); *see also Bales v. Bell*, 788 F.3d 568, 577 (6th Cir. 2015).

In sum, the trial court's rejection of Petitioner's third habeas ground was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Moreover, trial counsel's decision to stipulate to the admission of the plea undoubtedly was strategic, for the reasons already set forth, and therefore was presumptively reasonable. *See Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. at 101). Petitioner wholly fails to meet his burden of overcoming the presumption of

reasonableness by showing that counsel's performance fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

> III.   Ground IV: Failure to Ascertain that Petitioner Knowingly and Intelligently Waived His Right to Testify

Petitioner argues that the trial court violated his right to due process when it failed to make a record demonstrating the Petitioner had knowingly and intelligently waived his right to testify. The trial court addressed the issue as follows:

> The right to testify on one's own behalf at a criminal trial, although not absolute, is guaranteed by due process. *People v Solomon (Amended Opinion)*, 220 Mich App 527, 533-534; 560 NW2d 651 (1996). Furthermore, a trial court has no duty to ascertain on the record that a defendant has intelligently and knowingly waived his right to testify. *People v Bell*, 209 Mich App 273, 277; 530 NW2d 167 (1995). If the record established that a defendant decided not to testify or acquiesced in his attorney's decision that he not testify, the right to testify will be deemed waived. *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985). Here, Defendant concedes that the record reflects his counsel represented to this Court that he waived his right to testify. Therefore, Defendant has failed to establish the claimed error was plain, or that the error affected his substantial rights. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

(10/12/11 Cir. Ct. Op. & Ord., 6, ECF No. 40.)

Although the state court cited only Michigan law, the reasoning of the decision and the cases on which the decision relied are fully consistent with the precedent of the United States Supreme Court. It is well established that defendants in criminal cases have a constitutional right to testify. *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987). However, the Supreme Court has never held that a defendant's waiver of his right to testify was subject to the requirements of *Johnson v. Zerbst*, 304 U.S. 458, 462-63 (1938) (requiring an on-the-record explanation of rights and risks and a knowing and intelligent waiver of the right to counsel made on the record). *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000). The Sixth

Circuit has expressly recognized that, "[b]arring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." *Webber*, 208 F.3d at 551.

In the instant case, the record reflected that, just before the prosecution formally rested, the trial court and defense engaged in a lengthy colloquy with Petitioner outside the presence of the jury, concerning Petitioner's right to testify or to refuse to testify at trial. (*See* Tr. V, 89-94.) Thereafter, counsel made a brief opening statement, Petitioner's mother testified, and the trial recessed for a short break. (*Id.*, 96-106.) Before the jury was brought back in, the following colloquy occurred:

> MR. ZAIDAN [DEFENSE COUNSEL]: May it please the Court, Your Honor, I just want to make it clear that in discussion with Mr. Hill and his mother that he has chosen not to testify. I somewhat concur in that – I do concur in that. I think that anything he has to add will not further his case anymore than where we are at a[t] this point. For those reasons, I just want the Court to be aware that's the reason I have chosen not to – or he has chose, and we have discussed it and that we are not going to have him testify.

> THE COURT: Before we broke for lunch we made somewhat of a record regarding Mr. Hill's right to testify or not to testify, whichever he wanted, and if he chose not to testify that that would not – the jury would be instructed that they could not use that against him, and they could not consider the fact that [he did] not testify. Mr. Hill indicated he may have wanted to testify, but I assume you discussed it with him and his mother over lunch – over the break.

> MR. ZAIDAN: I did discuss it with his mother and I discussed it with him, and he's somewhat concerned himself about the testimony, so under those circumstances we felt it will be in the best interest to rest at this time.

(*Id.*, 106-07.) Because Petitioner expressed no disagreement with his attorney's representations, it is apparent from the record that Petitioner waived his right to testify. *Webber*, 208 F.3d at 551. The state court therefore reasonably concluded that Petitioner's fourth habeas ground was meritless.

-40-

IV.   Ineffective Assistance of Trial Counsel

In his fifth ground for habeas relief, Petitioner argues that trial counsel was ineffective for the alleged errors discussed in Grounds I, II, III and IV of the petition.  He also argues that trial counsel knew of Petitioner's desire to testify, but talked with Petitioner's mother, who encouraged him to waive his right to testify.  Petitioner also argues that his attorney failed to adequately investigate the prosecution witnesses and failed to obtain copies of the police reports concerning the prior confrontations between Vezirovic and the victims.  He suggests that, had counsel adequately investigated, he would have been able to impeach prosecution witnesses more effectively.

The Court previously rejected Petitioner's claims of ineffective assistance of counsel respecting Grounds I, II, III of the petition.  As indicated, because the alleged trial errors lacked merit, counsel was not ineffective in failing to lodge meritless objections to them.  *Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506.

With respect to Ground IV, the Court has concluded that Petitioner did not have a constitutional right to an on-the-record waiver of his right to testify.  While Petitioner suggests that counsel used persuasion to convince Petitioner's mother and Petitioner himself that testifying presented dangers and was not advisable, Petitioner at no time suggests that he did not agree with counsel's recommendation, nor does he argue that counsel consulted with Petitioner's mother without Petitioner's consent.  In fact, as is apparent from the lengthy colloquy regarding Petitioner's rights, Petitioner was consulting his mother, both before and after he decided not to testify.  The fact that counsel believed that decision to be prudent was indicative of counsel's strategic decisionmaking, and the record reflects that Petitioner was fully advised.  As previously discussed, in considering claims of ineffective assistance of counsel, the Court indulges a

strong presumption that an attorney's conduct falls within the wide range of reasonable professional assistance, and Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689 (citing *Michel*, 350 U.S. at 101). Petitioner's argument fails to meet that burden.

Moreover, Petitioner's argument that counsel should have obtained the police reports is unpersuasive. The record is replete with questions by both defense attorneys and the prosecutor concerning the police reports filed by Vezirovic and Ruka Anadoli against one another. Petitioner fails to identify any specific information that would have provided an additional basis for cross-examination. He therefore fails to demonstrate either the performance or the prejudice prong of his claim of ineffective assistance of counsel. The state court's decision, therefore, was an entirely reasonable application of clearly established Supreme Court precedent.

V.      Ground VI:  Ineffective Assistance of Appellate Counsel

Petitioner next argues that his appellate attorney rendered ineffective assistance of counsel when he failed to raise on direct appeal the claims presented in Petitioner's motion for relief from judgment.

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney

-42-

has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

As discussed in Parts I to IV of this discussion, Petitioner has failed to demonstrate that any of the grounds raised in his motion for relief from judgment were meritorious. Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal). Petitioner's sixth habeas ground therefore will be denied.

VI.     Grounds VII and VIII:  Non-Constitutional Claims

In his seventh habeas ground, Petitioner contends that the trial court erred in concluding that he had failed to demonstrate cause and prejudice for failing to raise his claims on direct appeal, as required by MICH. CT. R. 6.508(D)(3). In his eighth ground for relief, Petitioner argues that the decisions of the Michigan Court of Appeals and the Michigan Supreme Court that Petitioner had "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)" did not constitute merits-based decisions subject to deferential habeas review.

With respect to Ground VII, "'a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf*, 722 F.3d at 746 (quoting *Bradshaw*, 546 U.S. at 76). As a result, this Court cannot review whether the state court properly followed its own rules in determining that Petitioner did not demonstrate

cause for his failure to raise his claims on direct appeal. In any event, the trial court actually looked at the merits of each of Petitioner's claims as a prerequisite for determining that appellate counsel had not been ineffective in failing to raise those claims. Moreover, this Court reviewed the trial court's merits-based decisions and found no error.

Petitioner's final argument also does not rise to the level of an independent habeas claim. The question of whether the state appellate court decisions were merits-based is relevant solely to the question of whether Petitioner procedurally defaulted any of his claims.[7] This Court, however, did not rely on Petitioner's procedural default of any claim. Instead, the Court reached each of Petitioner's constitutional claims on the merits. Petitioner's argument therefore is irrelevant to the resolution of his habeas petition.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to present a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals

---

[7] In *Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010) (en banc), the Sixth Circuit held that brief form orders by the Michigan appellate courts invoking Mich. Ct. R. 6.508(D) are unexplained orders within the meaning of *Ylst*, 501 U.S. at 803. Such form orders are presumed to uphold or reject the last reasoned decision below. *Guilmette*, 624 F.3d at 291-92 (citing *Ylst*, 501 U.S. at 803). As a result, absent an explained decision from a lower Michigan court applying the procedural prohibition of Rule 6.508(D), the federal court may not invoke procedural default to dispose of a habeas claim that has been rejected by the Michigan courts on the grounds of MCR 6.508(D). *See also McClellan v. Rapelje*, No.11-1841, 2013 WL 135362, at *4 (6th Cir. Jan. 11, 2013) (holding that a lower court decision that explicitly denies relief under an established state procedural rule overcomes the presumption set forth in *Werth v. Bell*, 692 F.3d 486, 493 (6th Cir. 2012) (holding that "an unexplained summary order [of a state appellate court] is an adjudication on the merits for AEDPA purposes)).

has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.

Dated:   __August 24, 2016__          /s/ Paul L. Maloney_____
                                      Paul L. Maloney
                                      United States District Judge